**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 09-115-DLB-JGW**

**VALERIE BRADFORD, ET AL.**                          **PLAINTIFFS**

**vs.**                **MEMORANDUM OPINION AND ORDER**

**BRACKEN COUNTY, ET AL.**                        **DEFENDANTS**

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiffs commenced this wrongful death action against multiple police officers and their employers after the officers deployed deadly force against Robert Bradford, causing his death, while attempting to arrest him for domestic violence.  Plaintiff Valerie Bradford brings claims on behalf of Robert Bradford's estate against the individual Defendants under 42 U.S.C. § 1983 for excessive use of force, as well as related state law claims of battery and negligence.  She also asserts claims against the municipal Defendants under 42 U.S.C. § 1983 for failing to train the officers on the use of deadly force, as well as a claim for violating Robert's Kentucky constitutional rights.  Finally, Plaintiffs Valerie Bradford and N.B. each assert a loss of consortium claim against various individual Defendants. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is currently before the Court on two Motions for Summary Judgment submitted by the Defendants (Docs. # 76, 77[1]), which have been fully briefed and are now

---

[1] Defendants Herb Rumford, Bracken County and Campbell County filed Doc. # 76.  That motion also argues on behalf of "Unknown" Bracken and Campbell County Defendants named in Plaintiffs' Amended Complaint.  Defendants Tom Lilley, Aaron Beighle, Steven Robb and Chris Jaskowiak filed Doc. # 77.

ripe for review.  (Docs. # 83, 84, 86).

Additionally, Defendants have filed a Joint Motion to Strike Plaintiffs' Expert Report (Doc. # 85) pursuant to Federal Rule of Civil Procedure 37(c)(1).  Plaintiffs disclosed the expert report for the first time when they attached it to their Response to the Motions for Summary Judgment.  That motion has also been fully briefed (Docs. # 93, 94), and is ripe for review.  Having reviewed the record, the parties' briefs and the applicable law, the Court finds that it can adjudicate the motions without the benefit of oral argument.

## I.  FACTUAL BACKGROUND

Robert Bradford was killed in a shooting incident on his 150-acre property near Eden Ridge Road, in Bracken County, Kentucky on the night of May 31, 2009.  At approximately 6:00 p.m. that evening, Plaintiff Valerie Bradford ("Valerie") returned home to the Bradford property after having dinner with her son and other relatives at a nearby restaurant.  Upon returning to the property, Valerie parked her car at the residence and walked towards the family's workshop to deliver dinner to Robert.  She stood outside the shop and waited for Robert, whom she could see in an adjacent field moving hay.  As Robert approached on a tractor, he appeared angry and acted as if he did not see Valerie standing in front of his path.  Valerie moved out of the way to avoid being hit, fearing that Robert intended to run her over, as Robert passed by.

Valerie then walked to the shop, put Robert's dinner in a refrigerator, and sat down for a brief moment.  Robert entered the shop soon thereafter yelling at Valerie to "get out of here."  (Doc. # 78-1, at 133).  He pushed her to the ground and then grabbed her by the hair as he threw her out the door.  During the altercation, Robert told Valerie that she had one hour to "get [her] stuff and get out."  (*Id.* at 136).

2

Valerie returned to the house to pack up and leave.  She then heard Robert following behind her on his tractor.  Fearing what Robert might do, Valerie escaped the house through the basement and got in her car to leave.  She backed down the driveway, but then returned to the house because she was concerned about Robert's well being.  Once inside, Robert told her, "you don't need [your purse and clothes].  I just want you to leave."  (*Id.* at 145-46).

As she left for a second time, she noticed a rifle and ammunition sitting out.  Valerie did not recall the rifle or ammunition sitting out just minutes before.  She grabbed the rifle and attempted to escape, but fell as she was running down the gravel driveway.  Robert approached her, raised her up by her hair and told her, "I'll kill you and I'll kill myself."  (*Id.* at 150).  Valerie got in her car and drove off.

Valerie parked her car on Eden Ridge Road, not far from the Bradford property, and called 911.  She told the 911 operator, "My husband has a gun and he threatened to kill me . . . I'm afraid he's going to kill himself."  (Doc. # 76-1, Ex. A, p. 3).  The 911 operator then relayed this information to Defendant Herb Rumford, Bracken County Deputy Sheriff, who responded to the scene.

Upon arriving at the scene, Deputy Rumford immediately noticed that Valerie had been crying.  Valerie's neck appeared to be red with choke marks, her hair was disheveled, and her arm had a two-inch wide abrasion on it.  Valerie explained to Deputy Rumford that Robert "was very angry, he had been drinking, and he told her to get her F-ing stuff out of his house."  (Doc. # 78-2, at 21).  She also reported that "he had grabbed her by the hair and threw her across the shop floor," and told her "if you come back, I'll kill you and myself."  (*Id.*).   Finally, she warned Deputy Rumford to "be very careful because he is

mad, he is drunk, and he does have guns." (*Id.* at 22).  Based upon Valerie's reports, Deputy Rumford requested backup to accompany him as he confronted Robert.

Defendant Steven Robb, a Trooper with the Kentucky State Police, received the call for backup and responded to the scene.  Deputy Rumford briefed Trooper Robb on Valerie's report.  Trooper Robb also spoke directly to Valerie, who repeated the complaints she previously made to Rumford.  In light of Valerie's report and her obvious physical injuries, Trooper Robb and Deputy Rumford decided to approach Robert and take him into custody for domestic violence.

Deputy Rumford and Trooper Robb drove their police vehicles up the Bradford's driveway and parked on opposite sides of the residence.  Trooper Robb, dressed in uniform, exited his vehicle and began walking around the residence, looking in windows for any signs of Robert.

As Deputy Rumford exited his police vehicle, he looked toward the residence and saw Robert standing around a corner with a rifle pointed at him.  Deputy Rumford had not drawn his own at this point.  Deputy Rumford ordered Robert to put the rifle down and explained that he wanted to talk.  Robert refused to comply and demanded that the officers leave.  With his rifle still pointed at Deputy Rumford, Robert also yelled, "I could've took you two out coming back the driveway . . . [Y]ou two get off my property . . . [Y]ou see that garage door open, and it's all going to be over."  (Doc. # 78-2, at 31).

Hearing Deputy Rumford speaking to someone, Trooper Robb continued around the house towards Deputy Rumford's location.  As Trooper Robb turned a corner towards the back of the house, he and Robert immediately noticed each other.  Robert quickly turned the rifle and aimed it at Trooper Robb.  Recognizing the rifle, Trooper Robb yelled for

Robert to drop the weapon, and simultaneously ran towards his patrol vehicle for cover and fired a shot at Robert.

With Robert's attention focused on Trooper Robb, Deputy Rumford pulled his handgun out of its holster. As he looked back up, he saw Robert disappear behind the house. The officers continued their efforts to communicate with Robert and have him surrender, but Robert ignored their commands. Uncertain about Robert's location or his next move, the officers got back in their vehicles and retreated to find better concealment.

When they reached Eden Ridge Road, the officers exited their vehicles and found cover behind hay bales located on the Bradford property. Trooper Robb called his dispatcher, gave notice that shots had been fired and requested backup, while Deputy Rumford called Bracken County Sheriff Chuck Rechtin to update him on the situation.

From their vantage point behind the hay bales, Trooper Robb and Deputy Rumford observed Robert exit his home, get back on his tractor, pick up bales of hay and disappear to a field behind the house. When they next saw Robert, he pulled the tractor up to the front of his residence, went inside, and then returned to the tractor armed with two long guns. Robert proceeded to pick up two more bales of hay and then drove down to his shop. With one long gun in hand, Robert left his tractor and entered the shop. He reemerged shortly thereafter, only to grab the second long gun from the tractor and return back inside his shop.

Other officers began to arrive as Deputy Rumford and Trooper Robb continued to observe Robert's movement from their position behind hay bales. The responding officers also assumed positions behind hay bales and attempted to converse with Robert, explaining that they just wanted to talk and did not want anyone to get hurt. (*Id.* at 52).

5

Robert responded by opening the shop door, waiving his hands, and disappearing back into his shop.

Defendant Tom Lilley ("Lt. Lilley"), a lieutenant with the Kentucky State Police, arrived on scene and parked his marked vehicle near Robert's shop.  Yelling commands over the public address system in his vehicle, Lt. Lilley tried to get Robert to surrender. Robert responded by repeatedly emerging from the shop and waving his fist or one of the long guns in the air.

A short time later, Robert appeared from behind the shop driving a gas powered, 30-ton front-end loader ("loader").  He drove the loader down the driveway, maneuvered it around Lt. Lilley's vehicle, and continued on, driving in between two other parked vehicles. Robert then stopped the loader, opened the door, and yelled, "[w]here is the son of a bitch, where is that mother fucker who wanted to talk me [sic] at now?"  (Doc. # 78-5, pp. 68-69). Lt. Lilley stepped out from behind a hay bale and responded, "I'm right here; get off the loader; come down here."  (*Id.* at 73).  Robert refused to comply, but instead shut the loader's door and continued driving around the property.  As Robert drove past other officers, he steered with one hand and held a long gun in the air, shaking it at the officers.

Robert continued driving around the property, maneuvering around police vehicles and hay bales.  He then drove directly towards an unoccupied police vehicle, lowered the loader's bucket, and stopped the loader within a foot of the vehicle.  Defendant Aaron Beighle ("Sgt. Beighle"), a Sergeant with the Kentucky State Police, later explained that he believed Robert was attempting to scoop up the police vehicle with the bucket's loader. With the loader still stopped, Robert yelled to Sgt. Beighle, "Move your car, Herb," mistaking Sgt. Beighle for Deputy Rumford.  (Doc. # 78-4, at 52).

6

Robert then got back in the loader, reversed away from the police vehicle, and drove towards the hayfield.  He then stopped the loader for a third time.  During the third stop, Robert opened the loader's door, stepped out, and waived the gun in the air at the officers. He also asked Sgt. Beighle, "[w]hat do you think about that?" (*Id.* at 54).  Sgt. Beighle responded, "I don't want to kill you." (*Id.* at 55). Robert replied, "fuck you; I want you sons of bitches out of here; I want you to ... leave." (*Id.*).  He then returned inside the loader, shut the loader's door, and revved the engine.

As the engine revved, Lt. Lilley ran towards the loader and fired his shotgun at one of the loader's rear tires.[2]  The loader then began to move. Sgt. Beighle watched as pellets from Lt. Lilley's shots bounced off the thick tires.  In an effort to disable the loader, Beighle then fired three to four shots at the front right tire.  Those shots had little effect and the loader continued on, turning to the right towards the shop.  Beighle fired fix to six more shots at the same tire, but again those shots had no effect on the maneuverability of the loader.

Seemingly enraged by the officers' actions, Robert turned towards Lt. Lilley's parked police vehicle and accelerated.  He lowered the loader's bucket and rammed it into the driver's side of Lilley's vehicle, which was unoccupied.   Robert ultimately pushed the vehicle approximately twenty-five feet down the driveway.[3]  As Robert disengaged Lilley's

---

[2] Lt. Lilley testified that he shot at the tires after Robert stopped for a second time, while Sgt. Beighle testified that Lt. Lilley fired after Robert stopped for a third time.  Despite this minor inconsistency, Lilley and Beighle agree that Lilley fired shots at the tires after Robert emerged from the loader and waived a gun at the officers.

[3] Plaintiffs suggest that Robert was not in control of the loader when he hit Lilley's vehicle, or anytime thereafter.  Instead, they state that Robert "did not hit any of the vehicles until he was later shot by the officers and lost control of the loader." (Doc. # 83 at 4).  However, this version of the events will not be considered for purposes of the Motions for Summary Judgment, and cannot create a genuine issue of material fact.
Federal Rule of Civil Procedure 56(c)(1)(A) requires "a party asserting that a fact . . . is genuinely

vehicle, Detective Christopher Jaskowiak shouldered his M16 rifle and fired five rounds into the back window of the loader.  Jaskowiak could not tell whether his shots struck Robert, but he admitted that his shots struck the back window of the loader.

Jaskowiak had recently arrived on scene and believed that Lilley was "either at or in" the vehicle being thrown by the loader.  Jaskowiak admitted that he did not have visual confirmation that Lilley was inside the vehicle, but had heard Lilley talking over the public address system and radio mounted inside the vehicle.  Based on this information, Jaskowiak testified at his deposition that "at [that] time [he] felt that the operator of the loader was attempting to run over and injure or even kill Lieutenant Lilley," prompting him to fire at the loader.  (Doc. # 78-7, at 44).

After Jaskowiak fired five shots, Robert raised the loader's bucket, turned the loader to the right and drove it toward a nearby set of hay bales being used by other officers as protective cover.  As the loader swung to the right and accelerated, Lt. Lilley, Sgt. Aaron Beighle, and Trooper McTavish McDonald fired upon the loader, aiming to hit Robert.

Lt. Lilley, the first to fire during the sequence of fatal shots, was initially positioned outside of the loader's path.  Lilley explained that after Robert disengaged the vehicle, he

---

disputed" to support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."  Moreover, the Supreme Court held in *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986), that the nonmoving party must  "go beyond the pleadings" to designate a specific fact showing that there is a genuine issue for trial.

Here, Plaintiffs have failed to place this fact in the record so that it may be considered for purposes of the Motions for Summary Judgment. Plaintiffs' version of the events is based solely on factual allegations contained in their Complaint.  In fact, Plaintiffs specifically cite their Amended Complaint when they explain that "the Bices stated that Bradford did not hit any of the cruisers until he was later shot by the officers and lost control of the loader. (Doc. 26, p. 9)."  (Doc. # 83 at 4).  Plaintiffs have not submitted deposition testimony, an affidavit, or the like, from the Bices to support this factual allegation.  Therefore, Plaintiffs have failed to "go beyond the pleadings" to designate a specific fact showing that there is a genuine issue about whether Robert had control of the loader when he struck Lilley's vehicle.  *See Celotex*, 477 U.S. at 324.

saw Robert turn the loader toward a set of hay bales and raise the loader's bucket.  Lilley

then heard the loader's engine roar, suggesting that the loader was accelerating.  At that

point, Lilley believed Robert was driving directly towards McDonald, Beighle, and Rumford,

who were all positioned behind hay bales, and "was concerned about the safety of [his]

men that were in the hay."  (Doc. # 78-5, at 89, 90).  Lilley moved toward the loader and

fired two rounds at Robert from his Remington 870 shotgun.

 Sgt. Beighle described a similar scene.  As Robert disengaged from Lilley's vehicle,

Beighle had taken up position behind a hay bale adjacent to McDonald's position.  Beighle

explained that "as the loader articulated and the bucket began to swing, the path of the

bucket swung directly in front of Trooper McDonald's hay bale, was probably . . . about ten

feet or less from the hay bale that Trooper McDonald was at."  (Doc. # 78-4, at 66).

Beighle then observed the loader gain speed and saw the bucket of the loader emerge over

the top of McDonald's hay bale, approximately five feet from McDonald.  According to

Beighle, McDonald began to retreat and simultaneously fired at the loader with his M16A1

rifle.  At the same time, Beighle also saw Lilley run up along side of the loader and

discharge his shotgun.  Beighle, standing between five to six feet to the left of the bucket,

raised his rifle, aimed "on the actual cab" with the "object . . .to shoot at the operator of the

vehicle," and fired four to six rounds.  (*Id.* at 67-68).  Beighle later explained that he fired

at Robert because he had a duty to protect McDonald, whom he believed was facing

imminent harm.  (*Id.* at 135-36).

 After Lilley, McDonald and Beighle fired at the loader, Deputy Herb Rumford

explained that Robert turned the loader to the left and drove towards him.  At that time,

Rumford was approximately 40 to 50 feet from the loader, positioned behind a bale of hay.

As the loader approached, Sheriff Rechtin yelled out to Rumford, "get out of there, he's coming to you." Rumford emerged from behind the hay bale, aimed his Ruger Mini 14 .223 caliber rifle at Robert's chest, and fired. While Rumford was firing, "the loader stopped, Mr. Bradford slumped to his right in the seat, he raised back up and slumped again, and there was no more shots." (Doc. # 78-2, at 81).

The loader finally came to a rest on top of the hay bale that McDonald has previously used for protective cover. Lt. Lilley ordered the officers to cease fire. Lilley climbed into the cab of the loader, removed the rifle that Robert had been carrying, and secured Robert's hands. Robert was then lowered to the ground. He was bleeding from his head, chest, and arms, "barely" breathing, and unconscious. (Doc. # 78-2, at 83-85). Robert ultimately died en route to a hospital in Maysville, Kentucky.

## II.   ANALYSIS

### A.   The Report of James Werner is Stricken from the Record for Failure to Comply with Federal Rule of Civil Procedure 26(a)(2)

Defendants move the Court to strike the report of Plaintiffs' expert, James Werner,[4] from the record. (Doc. # 85). Plaintiffs attached Werner's report to their January 6, 2012 Response to Defendants' Motions for Summary Judgment (Doc. # 83-1), which was the first time the report was disclosed to the Defendants. Defendants argue, *inter alia*, that the

---

[4] Werner's report contains three statements that are particularly relevant to Plaintiffs' claims. First, Werner stated that "[a]ll officers were able to move out of the way, as Trooper MacDonald [sic] stated he was moving to his left, but instead started firing after seeing and hearing Lt. Lilley move from a position of concealment toward the front loader, start firing and then personnel also started firing." (Doc. # 83-1, at 4). Second, Werner claimed that "by [the officers' own] words Mr. Bradford was not attempting to escape custody. He in fact was in a contained area and officers were awaiting arrival of the SRT unit trained to deal with these situations." (*Id.*). Finally, Werner stated, "[w]hile I do not have the training records at this time to confirm the level of knowledge of training of the involved officers for handling these situations, it appears from their actions that this training was not provided or insufficient." (*Id.* at 5).

report was not disclosed in a timely fashion in accordance with Federal Rule of Civil Procedure 26(a)(2), and must therefore be stricken from the record pursuant to Rule 37(c)(1).

Rule 26(a)(2)(A) requires a party to disclose the identity of any witness that it may use at trial to present expert testimony. Rule 26(a)(2)(B) states that "this disclosure must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case . . . ." Furthermore, Rule 26(a)(2)(D) requires the party to provide the identity of the expert and the expert's report "at the time and in the sequence that the court orders."

Here, the parties entered an Agreed Scheduling Order, signed by United States Magistrate Judge J. Gregory Wehrman, on February 4, 2011, which required Plaintiffs to submit their Rule 26(a)(2) Expert Witness Disclosure Reports on or before August 31, 2011. (Doc. # 68). On August 31, 2011, Plaintiffs gave Defendants notice that Jim Werner had been retained as their expert. (Doc. # 93-1). Plaintiffs also stated that "[Werner's] report and CV will be forthcoming." It was not until January 6, 2012, that Plaintiffs finally disclosed Werner's report. However, in accordance with the Court's Scheduling Order and Rule 26(a)(2)(B), Plaintiffs were required to disclose Werner's report on August 31, 2011 at the same time they disclosed Werner as their expert.[5] Having failed to do so, Plaintiffs failed to comply with Rule 26(a)(2).

---

[5] Federal 26(a)(2)(B) provides two exceptions to the general rule that the disclosure of the expert's identity must be accompanied by the expert's report: (1) if it is stipulated by the parties or (2) ordered by the Court. Plaintiffs have not argued that either of these exceptions to the general rule apply, nor is the Court aware of any stipulation or Court order that would have permitted Plaintiffs to submit the expert report after disclosing Werner's identity. Therefore, neither exception applies.

Federal Rule of Civil Procedure 37(c)(1) "requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (internal quotations and citation omitted).  More specifically, Rule 37(c)(1) states, in pertinent part, "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party *is not allowed* to use that information or witness to supply evidence on a motion, at a hearing or at a trial."  (emphasis added).  Sanctions are mandatory unless the noncomplying party is able to prove that its non-compliance was substantially justified or harmless. *Roberts*, 325 F.3d at 782.

Plaintiffs argue that their failure to disclose Werner's report was harmless and, therefore, the report should be considered.  Plaintiffs cite *Roberts v. Galen of Virginia* and the commentary to Rule 37(c)(1) for the proposition that "a harmless violation involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party."  *Id.* at 783 (internal citations and quotations omitted).  Plaintiffs then contend that "due to inadvertence and oversight, . . . the report [was] not provided."  (Doc. # 93, at 1).  They also argue that Plaintiffs "never took any steps, under either L.R. 37.1 or Fed. R. Civ. P. 37, to obtain [Werner's] report."  Therefore, according to Plaintiffs, their failure to disclose Werner's report was harmless.  The Court disagrees.

Plaintiffs' argument is entirely disingenuous. On November 30, 2011, nearly three months *after* Plaintiffs were required to disclose their expert reports, Defendants filed their Motions for Summary Judgment.  Eight days later, on December 8, 2011, Werner rendered his report.  (Doc. # 83-1, at 5).  Considering the timing of Werner's report, Plaintiffs did not

simply forget to disclose the report in August, 2011 or any time thereafter as they suggest. Instead, they never had the report to begin with. This is by no means an "honest mistake" as described by the commentary to Rule 37(c)(1). Rather, it appears that with the benefit of Defendants' Motion for Summary Judgment that argued Plaintiffs had failed to provide any facts to support municipal liability, Plaintiffs later had Werner offer a report to the contrary in order to create a genuine issue of material fact. Ultimately, counsel's failure to disclose the expert report was not due to "inadvertence," but was a calculated decision in response to arguments made in the Motions for Summary Judgment.

Moreover, even if Plaintiffs' failure was attributable to an "honest mistake," Defendants did not have sufficient knowledge of the report to render Plaintiffs' failure harmless. In order to find that a party's failure to comply with Rule 26(a) was harmless, the Sixth Circuit considers whether the opposing party had notice of the expert's identity *and* the substance of the expert's report. *See Roberts*, 325 F.3d at 783 (affirming district court's decision to allow an expert to testify, despite the party's failure to disclose the expert's report, when the opposing party knew the expert's identity and the substance of his testimony); *Ames v. Van Dyne*, No. 95-3376, 1996 WL 662899, at *4-5 (6th Cir. Nov. 13, 1993) (affirming the exclusion of an expert witness at trial when the opponents had no advance knowledge of the fact that the witness would testify); *Bowe v. Consolidated Rail Corp.*, No. 99-4091, 2000 WL 1434584, at *3-4 (6th Cir. Sept. 19, 2000) (affirming the exclusion of an expert witness at trial when the defendants had no knowledge of the substance of the expert's reports). Here, while Defendants knew that Werner had been identified as Plaintiffs' expert, Defendants had no knowledge about the substance of his opinions or the contents of his report until after they filed their Motions for Summary

13

Judgment.   Therefore, Plaintiffs' failure to disclose Werner's expert report cannot be considered harmless and Plaintiffs are unable to excuse their failure to timely disclose Werner's report.

Plaintiffs unconvincingly argue that the circumstances surrounding their failure to disclose Werner's report are similar to those considered in *Roberts v. Galen of Virginia*, where the Sixth Circuit concluded that the district court committed no error in allowing the expert testimony.   In *Roberts*, the plaintiff properly disclosed the identity and report of the expert witness they intended to call at trial.   325 F.3d at 782.   Due to interlocutory appeals to the Sixth Circuit and Supreme Court, the case was tried seven years after the suit was originally filed.   *Id.*   Because of the delay, the original expert witness was no longer available to testify.   *Id.*   At least seven months before the trial began, the plaintiff gave notice that it intended to call another expert who would provide the same conclusions as the original expert.   *Id.*   At the final pretrial conference, the defendant moved to exclude the new expert witness because his CV and report had not been supplied.   *Id.* at 283.   The trial court ordered the plaintiff to provide the new expert's CV and report, and ordered that the new expert could only testify to conclusions in the original expert's report.   *Id.*

The Sixth Circuit ruled, *inter alia*, that the plaintiff's failure to disclose the expert report was harmless.   *Id.*   Specifically, the court found that the defendant knew who was going to testify and to what the expert was going to testify.   *Id.*   Although the plaintiff tardily disclosed the new expert's report, the defendant knew at least seven months before trial that the expert would testify consistent with the prior expert's report.   As such, the defendant had adequate knowledge about the substance of the new expert's testimony. *Id.*   The court also noted that defense counsel knew that they had not received the expert

report and waited five months to object, which supported the court's finding that the plaintiff's tardy disclosure was harmless or substantially justified.  *Id.*

Contrary to Plaintiffs' assertion, *Roberts* is not factually similar to this case.  In *Roberts*, although the defendant was not provided with a copy of the expert's report, the defendant knew that the expert would testify consistently with a report from a previous expert.  Here, Defendants never had *any* indication about the contents of Werner's report until it was disclosed *after* the Motions for Summary Judgment were filed.

Moreover, Defendants failure to request the expert report cannot support the conclusion that Plaintiffs' tardy disclosure was harmless or substantially justified.  In *Roberts*, the court found that the plaintiff made an honest mistake in failing to disclose the expert report.  *Id.*  The court found that this honest mistake was harmless, in part, because the defendant knew that the report had not been disclosed and failed to request it.  *Id.* Here, there is no need to consider whether Defendants should have requested the expert report because the Court has already concluded that Plaintiffs' failure to disclose the expert report was the product of a calculated decision.

Having determined that Plaintiffs failed to disclose Werner's report in compliance with Rule 26(a) or otherwise excuse this failure by showing that it was substantially justified or harmless, Rule 37(c)(1) mandates that Plaintiffs be sanctioned.  However, "Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety," but instead the court may exercise its discretion in imposing other appropriate sanctions.  *Roberts*, 325 F.3d at 784.

In a factually similar case, the Sixth Circuit affirmed the district court's decision to exclude a plaintiff's expert report.  *Borg v. Chase Manhattan Bank USA*, 247 F. App'x 627

(2007). In *Borg*, the plaintiffs disclosed an affidavit from their expert nearly six months after the expert disclosure deadline had passed. *Id.* at 636. Like Plaintiffs here, the plaintiffs in *Borg* attached the expert affidavit to their response in opposition to a motion for summary judgment. *Id.* The plaintiffs also relied almost exclusively on the expert's affidavit to show that there were genuine issues of material fact that precluded summary judgment in favor of the defendants. *Id.* The district court excluded the expert affidavit pursuant to Rule 37(c)(1), finding that it was not disclosed in compliance with Rule 26(a)(2), and would prejudice defendants because they had not had an opportunity to depose the expert. *Id.* The Sixth Circuit affirmed the trial court's decision, concluding that the plaintiffs had not shown that their untimely disclosure was harmless or substantially justified. *Id.*

Like the district court found in *Borg*, excluding Werner's report is the only appropriate sanction in this case. Defendants would be strongly prejudiced if the Court were to consider the expert report because they have not had the opportunity to depose him. Moreover, the nature and circumstances of Plaintiffs' disclosure of Werner's report make their tardy disclosure much more egregious than the disclosure in *Borg*. As explained above, Plaintiffs did not simply forget to disclose the report as they suggest. Instead, based on the date on which the report was rendered, Plaintiffs made a conscious, calculated attempt to have Werner render an "expert" report after having the benefit of reviewing Defendants' Motions for Summary Judgment. Accordingly, the report of Mr. James Werner will not be considered for purposes of Defendants' Motions for Summary Judgment and is stricken from the record.

**B.    Defendants' Motions for Summary Judgment**

**1.    Standard of Review**

16

A court may grant summary judgment pursuant to Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the non-moving party. *Mutsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, it must produce evidence showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). The nonmoving party may demonstrate that genuine issues of fact are present by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed.R.Civ.P. 56(c)(1)(A) and (B). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### 2. Plaintiffs' Claims Against Unknown Sheriff's Deputies and Campbell County Police Officers

In the Amended Complaint (Doc. # 26), Plaintiffs' assert several state and federal claims against Unknown Sheriff's Deputies and Campbell County Police Officers.

However, Plaintiffs have yet to identify these "unknown" defendants or serve them with civil Summons and the Amended Complaint.  Federal Rule of Civil Procedure 4(m) states, in pertinent part:

> If a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Plaintiffs filed their Complaint on July 20, 2009 (Doc. # 1) and their Amended Complaint on June 10, 2010 (Doc. # 26).   After an extension of the original discovery deadline, the parties had until October 31, 2011 to complete all fact discovery.  In fact, Plaintiffs were given more than two years from the date of the original complaint to conduct discovery, but failed to identify the Unknown Defendants and serve them with civil summonses and the Complaint, clearly in violation of the time limit provided by Rule 4(m).  Instead of showing "good cause" for this failure, Plaintiffs have conceded that it is appropriate to dismiss the claims against the Unknown Defendants.

Any claim dismissed under Rule 4(m) shall be dismissed without prejudice.  However, if the party would be barred by the applicable statute of limitations from refiling the claim, the Sixth Circuit has held that it is appropriate to dismiss the claim with prejudice.  *Petty v. County of Franklin*, 478 F.3d 341, 346 n. 3 (6th Cir. 2007) (citing 3 Moore's Federal Practice § 4.82[3] ("[A]ny dismissal ordered [under Rule 4(m)] after expiration of the statute of limitations for failure to establish good cause will be, in effect, with prejudice since plaintiff will be precluded from commencing a new action.")).  Here, Plaintiffs' Section 1983 claims and related state law claims are subject to the same one-year statute of limitations period.  *See Hall v. Spencer County*, 583 F.3d 930, 933 (6th Cir. 2009) (holding that claims

18

under Section 1983 are governed by the statute of limitations for personal-injury tort actions in the state where the cause of action originated, which is one year under Kentucky law). Each cause of action accrued on May 31, 2009, the date of the fatal shooting, and, thus, the statutory period of limitations ran on May 31, 2010. *See id.* ("The cause of action accrues on the date of the injury to the person even though the extent of the injury is not known until later."). As a result, Plaintiffs would be barred from filing a *new* complaint against the Unknown Defendants. Therefore, the claims against Unknown Sheriff's Deputies and Campbell County Police Officers are dismissed with prejudice.

### 3. The Individual Defendants Are Entitled To Summary Judgment on Plaintiffs' Section 1983 Claim

In Plaintiffs' Amended Complaint, they allege that the individual defendants used excessive force against Robert Bradford in violation of his Fourth and Fourteenth Amendment Rights, giving rise to a cause of action under 42 U.S.C. § 1983. Defendants have moved for summary judgment on this claim, arguing that they are entitled to qualified immunity because they did not violate Robert's constitutional rights, or alternatively the constitutional right was not clearly established.

Qualified immunity is an affirmative defense that shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether qualified immunity is warranted, the Sixth Circuit instructs district courts to apply a two-part test. *Sigley v. City of Parma Heights*, 437 F.3d 527, 536-37 (6th

Cir. 2006).[6]  First, the "court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time the defendant's alleged misconduct."  *Id.*

### (a)     Constitutional Violation

In Plaintiffs' Amended Complaint, they allege that the individual defendants used excessive deadly force in violation of Robert's Fourth and Fourteenth Amendment rights. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Id.* at 395 (emphasis added).  More generalized notions of substantive due process, protected by the Fourteenth Amendment, are not to guide the court's inquiry into whether force was excessive.  *Id.*  Plaintiffs concede this point in their Response to the Motions to Dismiss.  Accordingly, the Court must determine whether the individual defendants violated Robert's Fourth Amendment rights by deploying deadly force.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  U.S. Const. Amend IV. A seizure has occurred

---

[6]  Some panels of the Sixth Circuit apply a three-part test instead.  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  The third step requires "the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right."  *Id.*  However, in excessive force cases the court must ask whether the officer's use of force was objectively unreasonable in order to find a constitutional violation under the first step, making it redundant to ask the same question in a third prong.  *Id.*  "Thus, qualified immunity in excessive force cases is a two-step analysis."  *Id.*

whenever an individual is apprehended by the use of deadly force.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  In determining whether a particular seizure was reasonable, the Court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8).  However, "'the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'"  *Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

The Sixth Circuit "has repeatedly noted that only in rare instances may an officer seize a suspect by use of deadly force."  *Green v. Taylor*, 239 F. App'x 952, 958 (6th Cir. 2007).  As a general rule, the use of deadly force is constitutionally reasonable "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ."  *Garner*, 471 U.S. at 11.  In applying this general rule, the Court must consider three factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight.  *Graham*, 490 U.S. at 396.  "These factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'"  *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).

Furthermore, the Court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Graham*, 490 U.S. at 397.  "The reasonableness of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Not every use of force, "even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Courts "must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 346 (6th Cir. 1992), *cert. denied*, 504 U.S. 915 (1992).  Instead, the Court must account "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

When considering the objective reasonableness of an officer's use of force, the Court must address each officer's potential liability individually based on his own actions. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).  "To hold an officer liable for the use of force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Generally, mere presence at the scene does not render an officer liable for another officer's use of force unless the plaintiff proves that the passive officer was directly responsible for the action.  *Id.*

The Court will analyze the actions of each named defendant using these standards.

### i.    Trooper Steven Robb's Use of Deadly Force Did Not Amount to a Seizure

Trooper Robb argues that he is entitled to summary judgment because there is no

evidence to suggest that the single shot he fired actually hit Robert.  Thus, Robb contends that he did not "seize" Robert within the meaning of a Fourth Amendment seizure.  Robb also argues that even if his shot struck Robert, he is still entitled to summary judgment because his use of force was reasonable under the circumstances.

A "seizure" occurs "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  Where a police officer makes a show of authority but the subject does not yield, there is no seizure under the Fourth Amendment.  *California v. Hodari D.*, 499 U.S. 621, 629 (1991).  More specifically, if an officer shoots a fleeing suspect but misses, there can be no seizure unless the suspect consciously submits to the officer's show of authority.  *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003); *See Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008) (holding that officer's firing his weapon at the suspect was a show of authority that actually had the intended effect of contribute to Floyd's immediate restraint).

Here, the evidence indicates that Robb fired one shot at Robert but missed. Plaintiffs have offered no evidence to indicate otherwise, and do not contest that Robb's shot missed Robert.  Robb and Deputy Rumford were the first officers to arrive at the Bradford residence on the night of May 31, 2009.  After Robb had exited his vehicle and begun to walk around the Bradford residence, he noticed Rumford emerge from his own police vehicle in a "surrendered position."  (Doc. # 78-3, p. 23).  Robb circled back towards Rumford to render assistance.  As he was circling the residence, he saw Robert appear from behind a corner with a rifle aimed directly at him.  (*Id.* at 27).  Without the benefit of any concealment, Robb "simultaneously . . . recognized the gun . . . shouted, drop the gun,

and [he] kind of ducked and started running to [his] left back towards cover, using the house, raising [his] firearm from where it had been in the low ready position, and fired." (*Id.* at 28).  Robb found cover behind his police vehicle, looked up, and saw Robert standing behind the house with his rifle pointed to the ground.  (*Id.* at 32).  At that point, Rumford continued to yell commands at Robert, but Robert refused to surrender.  Robert briefly emerged from behind the corner, "his hands were empty, and he was making motions." (*Id.* at 34).  Robert also yelled to the officers several times, "just shoot me."  (*Id.* at 35).  After a brief verbal exchange, Robert disappeared.  (*Id.* at 36).  None of Robb's deposition testimony suggested that Robert had been hit by Robb's shot.

Deputy Rumford's deposition testimony verifies that Robb's shot did not hit Robert. Rumford was asked, "When Trooper Robb fired at Robb, what was Robert's reacion to that?"  (Doc. # 78-2, pp. 35-36).  Rumford responded, "[when] he fired a shot, that's when – as soon as he fired the shot, [Robert] turned his head off of me, I drew, and he disappeared behind the house."  (*Id.*).  When Robert reappeared, he "was highly upset," and yelled to Rumford, "that vest ain't going to help you."  As Rumford states, he had an opportunity to observe Robert after Robb deployed deadly force, but Rumford makes no mention that Robert appeared to be hit by the bullet.

Because Robb admitted to deploying deadly force at Robert, the Court's inquiry does not end with the determination that Robb's shot missed.  In *Floyd v. City of Detroit*, the Sixth Circuit held that the court must also consider whether the shot caused the suspect to consciously submit to the officers's show of authority.  *Floyd*, 518 F.3d at 406.  In that case, as here, the officer fired his weapon at the plaintiff but missed.  *Id.* The plaintiff, however, "halted in his tracks upon hearing [the officer's] initial shot and even backed up

24

slightly, quickly yelling, 'I don't have a gun.'" *Id.*  The Sixth Circuit concluded that the "[officer's] firing his weapon at [the plaintiff] was a show of authority that actually had the intended effect of contributing to [the plaintiff's] immediate restraint."  *Id.*

The facts of this case are clearly distinguishable from *Floyd*, and indicate that Robb's show of force did not have the intended effect of causing Robert to surrender.  After Robb fired a shot at Robert, Robert briefly disappeared and then reemerged, challenging the officers to shoot him and threatening Rumford that a "vest ain't going to help [him]."  (Doc. # 78-2, p. 36).  Robb and Rumford retreated from the Bradford residence to find cover and await backup.  From a concealed position behind hay bales along Eden Ridge Road, Robb and Rumford saw Robert reappear from his home, climb aboard a tractor, pick up two bales of hay, and retreat behind his home.  These facts simply do not indicate that Robb's use of deadly force caused Robert to submit and surrender.  Therefore, Robb's shot did not amount to a seizure under the Fourth Amendment.

Assuming, *arguendo*, that Robb's shot at Robert did amount to a seizure under the Fourth Amendment, Robb's use of force was reasonable.  The use of deadly force by a police officer is justified "when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer."  *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005).  For example, in *Boyd v. Baeppler*, the Sixth Circuit held that officers reasonably deployed deadly force against a suspect who pointed his weapon at an officer.  215 F.3d 594, 604 (2000).  The *Boyd* Court held that reasonable police officers in the circumstances presented would have believed that the suspect was armed and remained an imminent threat and danger until he finally dropped his weapon.  *Id.*  Therefore, the court reversed the district court's denial of

summary judgment for the officers.  *Id.*  In a similar case, the Sixth Circuit held that an officer reasonably used deadly force against a child who pointed what was perceived to be a gun at the officer.  *Bell v. City of East Cleveland*, No. 96-3801, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997).  Although it was later determined that the child was only holding a toy gun, the officer had initially received a report that the child was carrying a gun in his front pocket and the officer also perceived the gun to be real when the child pointed it at the him.  *Id.*  Witnesses also verified that the gun appeared to be real.  *Id.*  The *Bell* Court held that the officer reasonably deployed deadly force because "a reasonable officer in [the defendant's] shoes would have feared for his life."  *Id.*

Like the plaintiffs' actions in *Boyd* and *Bell*, Robert's actions would have caused a reasonable officer to fear for his life such that Robb's responsive use of deadly force was reasonable.  When Robb met Rumford and Valerie Bradford on the AA Highway, Valerie explained that Robert had threatened to kill her and then kill himself.  (Doc. # 78-3, p. 16).  Valerie also recounted that Robert had thrown her down and shook her immediately before she called 911.  (*Id.*).  Valerie appeared to have red marks on her neck, and cuts and abrasions on her right arm, which were consistent with Valerie's report that Robert had physically assaulted her.  At this point, a reasonable officer would have believed that Robert was dangerous, and that he had at least threatened to kill others.

Just prior to Robb making contact with Robert, Robb saw Rumford "get[ ] out of his vehicle and he looked up and took a surrendered position with his hands in the air."  (Doc. # 78-3, p. 22).  Robb then heard Rumford say something to the effect of "Buddy, we'll get out of here, we'll back out and leave."  (*Id.* at 24).  Robb then saw the barrel of a gun around the corner of the Bradford residence, Robert emerged into Robb's view, and then

26

Robert pointed the rifle in Robb's direction. (*Id.* at 27).  In response, Robb shouted

commands at Robert, began to retreat to a concealed position, and fired.  (*Id.* at 28).  In this

rapidly evolving situation, and based on all the information that Robb knew, a reasonable

officer would have feared that he and Rumford were facing imminent harm.  Robb's use of

deadly force was reasonable under the circumstances and, thus, he did not violate Robert's

Fourth Amendment rights.[7]

### ii.     Detective Christopher Jaskowiak's Use of Deadly Force Was Reasonable[8]

Detective Jaskowiak argues that he is entitled to qualified immunity because his use

of deadly force was reasonable under the circumstances.  Jaskowiak's involvement began

at approximately 8:20 p.m. on the night at issue, nearly two hours after Valerie Bradford

originally reported domestic violence to the 911 operator.  At that time, Jaskowiak received

---

[7]    Plaintiffs do not allege that Robb is liable for failing to act to prevent McDonald, Lilley, Rumford, and Beighle from deploying deadly force that ultimately resulted in Robert's death.  Even if Plaintiffs did make that allegation, Robb would be entitled to summary judgment.  The Sixth Circuit has held that an officer who fails to act to prevent the use of excessive force may still be liable.  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  In such cases, the plaintiff must establish that (1) the officer observed or had reason to know that excessive force would be or was being used and (2) the officer had both the opportunity and the means to prevent the harm from occurring.  *Id.*

      Without determining whether Robb had reason to know that the other officers were using excessive force, Robb did not have the opportunity and the means to prevent the officers from firing the shots that killed Robert.  Just prior to the fatal sequence of shots being fired, Robb had run approximately a quarter to a half a mile to where Robert was driving the loader.  As Robert disengaged from Lilley's vehicle and turned towards the officers positioned behind hay bales, Robb was standing atop a hill on the opposite site of the road.  From that vantage point, Robb watched the officers fire at the loader.  Based on his location, Robb had neither the opportunity or the means to prevent the officers from shooting at the loader.  Therefore, Robb cannot be liable for failing to act to prevent the officers from deploying deadly force against Robert.

[8]    It is also doubtful that Jaskowiak's shots at Robert amounted to a seizure under the Fourth Amendment.  As was discussed in detail above, "shooting at a fleeing felon, but missing, is not a seizure," *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003), so long as the felon does not submit to the show of authority.  *Floyd*, 518 F.3d at 406.  Here, Jaskowiak admitted that his shots struck the loader, but he could not tell whether his shots struck Robert.  Plaintiffs have not offered any evidence to suggest that Jaskowiak's shots did, in fact, strike Robert.  Moreover, it does not appear that Robert submitted to Jaskowiak's show of authority.  To the contrary, after Jaskowiak fired five shots, Robert continued on in the loader, turning it and advancing up the hill.

a report that Robb had responded to a domestic disturbance, shots had been fired, and the suspect had fled. (Doc. # 78-7, p. 21). On his way to the scene, Jaskowiak heard that Lilly had arrived on scene and that Robert was inside the garage on the Bradford property. (*Id.* at 24-25). Once Jaskowiak arrived at the scene, he immediately met with Detective Lingle, who informed Jaskowiak that Robert said he "didn't want to be arrested, didn't want to be handcuffed, and that he was going to blow his brains out." (*Id.* at 29).

Jaskowiak and Lingle found cover behind a police vehicle and established a perimeter position to observe Robert's actions. Jaskowiak watched as Robert boarded the loader and proceeded to drive around the field. As Robert progressed across the hay fields in the loader, Jaskowiak began walking up a hill towards Robert's position. He then heard gunfire. (*Id.* at 39). Jaskowiak looked towards the loader, which did not appear to be affected and had no issues with maneuverability. (*Id.* at 41).

Jaskowiak then observed the loader make impact with Lilley's vehicle. Jaskowiak later explained, "[a]t this time I felt that the operator of the loader was attempting to run over and injure or even kill Lieutenant Lilley. So I shouldered my M16 and waited – I knew I had a clear line of fire. I wasn't firing it where I knew police officer to be. And I fired five rounds from my M16 into the back window of the loader." (*Id.* at 44-45).

When later asked why he fired, Jaskowiak explained that "[he] initially made the decision to fire when [Robert] made the immediate right-hand turn, just prior to striking his car, because [he] believ[ed] Lieutenant Lilley was either at or in that car." (*Id.*). Although Jaskowiak did not have visual verification that Lilley was in the proximity of the vehicle, Jaskowiak had recently heard Lilley "using the public address system and the state radio that is assigned – that is mounted inside the vehicle. And based upon the cord length of

28

the mics for those – that public address system, he couldn't have been more than – he would have had to have been right next to it or in the car." (*Id.*).

This is precisely the type of force that will not be scrutinized "with the 20/20 vision of hindsight" or "in the peace of a judge's chambers." *Graham*, 490 U.S. at 396. Jaskowiak's use of force was reasonable because he had probable cause to believe that Lilley was facing imminent harm when he fired 5 shots at the loader. Additionally, weighing each of the factors announced in *Graham* – the severity of the underlying offense, whether Robert posed immediate threat to the officers, and whether Robert was actively evading arrest – indicate that Jaskowiak's use of force was reasonable. *See id.*

At the time Jaskowiak fired the shots, he knew that shots had been fired at the Bradford property, though he did not know who was responsible for firing the shots. Jaskowiak also knew that Robert had allegedly assaulted his wife, threatened to kill himself, and refused to surrender. Knowing that Robert had exhibited prior violent conduct, Jaskowiak heard gun shots and then saw Robert driving the loader directly at Lilley's vehicle. Jaskowiak believed Lilley to be in or near the vehicle because he recently heard Lilley speaking over the public address system mounted inside the vehicle. Based on all of this information, a reasonable officer would have believed that the loader threatened imminent harm to Lilley. Thus, it was constitutionally permissible for Jaskowiak to deploy deadly force against Robert. *See Livermore*, 476 F.3d at 405 (holding that officer's use of force was reasonable because he had probable cause to believe that suspect posed serious threat to other officers based on the suspect's refusal to surrender, prior violent behavior, and close in proximity to other officers while armed with a rifle).

It is of no consequence that Jaskowiak deployed deadly force based on his mistaken belief that Lilley was inside or near his vehicle.  Nor does this fact create an issue for the jury.  The Sixth Circuit has "upheld the use of deadly force by a police officer when the factual situation revealed a *perceived* serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer."  *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (emphasis added) (citing *Boyd v. Baeppler*, 215 F.3d 594, 604 (6th Cir. 2000)).  Thus, the Court must focus on whether a reasonable officer would have believed that Lilley was in or near the vehicle and facing imminent harm.  *See Bell v. City of East Cleveland,* No. 96-3801, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for a police officer who shot and killed a boy who pointed a toy gun at the officer because the officer reasonably believed that the gun was real and that he was facing imminent harm).  As Jaskowiak explained, he did not see Lilley at or near the vehicle.  Rather, Jaskowiak had recently heard Lilley talking over the public address system mounted inside the vehicle.  Based on the length of the cord attached to the public address system's microphone, Jaskowiak believed that Lilley was either inside or near the vehicle.  Considering the information that Jaskowiak knew, and recognizing that this was a tense, uncertain, and rapidly evolving environment, a reasonable officer would have believed that Lilley was inside or near the vehicle and facing imminent harm from the quickly approaching loader.  As a result, Jaskowiak reasonably deployed deadly force against Robert and, therefore, did not violate Robert's Fourth Amendment rights.

### iii.  Lilley's, Beighle's and Rumford's use of force was reasonable

The uncontested evidence demonstrates that Lilley, Beighle and Rumford's use of

deadly force against Robert was objectively reasonable under the circumstances. Numerous facts support this conclusion, but one fact is essential – Robert was driving a multi-ton front-end loader directly at the officers with an demonstrated intent to inflict death or serious harm when the officers opened fire on Robert.  A reasonable officer would have concluded that Robert was posing an imminent danger to the officers and would have responded with deadly force.

**(a)       Severity of the alleged crime**

Each of the *Graham* factors weigh in favor of Lilley, Beighle, and Rumford, and support the conclusion that their use of force was reasonable.  Under the first factor, the Court must consider the severity of the alleged crime.  *Graham*, 490 U.S. at 396.  Here, Rumford initially received a report from dispatch that "there was a domestic going on at the Bradford residence."  After meeting with Valerie Bradford off the AA Highway, Rumford learned that Robert had physically assaulted Valerie, and threatened to kill her and then kill himself if she returned.  Rumford also saw that Valerie's neck was red from being choked, and she had abrasions on her right arm from being thrown to the ground.  Clearly, this information gave Rumford probable cause to arrest Robert for domestic violence, and charge him with at least assault in the fourth degree, a class A misdemeanor under Kentucky law.  *See* KRS § 508.030.[9]  Moreover, it gave the officers an initial indication that Robert had been violent and was still volatile.

---

[9] In *Tennessee v. Garner*, the Supreme Court rejected the common-law rule, "which allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant."  *Garner*, 471 U.S. at 12.  Instead, the Court required officers to assess the suspect's dangerousness before deploying deadly force.  *Id.* at 20.  Notably, the Court stated "the highly technical felony/misdemeanor distinction is . . . difficult to apply in the field.  An officer is in no position to know, for example, the precise value of property stolen, or whether the crime was a first or second offense."  *Id.*

**(b)** **Imminent threat to the safety of police officers or others**

The second *Graham* factor – whether the suspect poses an imminent threat to the safety of the officers or others – overwhelmingly weighs in the officers' favor.  *See Graham*, 490 U.S. at 396.  Each of the officers had watched as Robert boarded the loader, drove around the hay field, and made intermittent stops to threaten the officers.  During one stop, Robert opened the door of the loader and yelled, "where the – where the son of a bitch, the mother fucker who wanted to talk to me, where is he at now?"  (Doc. # 78-5, pp. 68-69).  During another stop, Robert again opened the door, held a rifle at its midpoint and shook it while yelling at the officers.

Lilley and Beighle attempted to disable the loader by firing at the tires, but their attempts failed.  Robert then turned the loader, lowered the loader's bucket, and hit Lilley's unoccupied vehicle, pushing it down the hill.  Robert then disengaged from the vehicle, began raising the loader's bucket, turned to his right towards the hay bales being used as cover by McDonald, Beighle, Rumford and others.  Robert then revved the loader's engine.  Lilley explained that the loader was driving faster than he could run and that everything was "happening very quickly."

At that point, Lilley "was concerned about the safety of [his] men that were in the hay."  (Doc. # 78-5, p. 90).  Lilley then moved towards the loader, which was continuing to accelerate, and fired two fired two shots from his shotgun at Robert.  Lilley also observed other officers that he perceived to be in the path of the loader simultaneously back up and fire towards the loader.  Later, Lilley was questioned on whether his shots at Robert would have actually prevented the loader from hitting other officers.  Lilley explained that "[a] dead

32

operator would not be able to function" and "if the operator was not actively engaged in controlling the loader as he was, that there would be no further attempts as he went ...." (Lilley Dep., at p. 90).

Beighle also recounted that he deployed deadly force to protect the lives of others. As Robert disengaged from Lilley's vehicle, Beighle watched as the loader picked up speed and headed toward the hay bales. The loader continued to accelerate as it was ten feet or less from Trooper McDonald. When the loader was no more than five feet from McDonald's position, Beighle saw Lilley and McDonald firing at Robert. Bieghle, too, fired four to six shots at Robert. Based on how Robert's maneuvered of the loader, Beighle later explained that he had "no doubt" that Robert was trying to kill police officers. Under these circumstances, a reasonable officer in Beighle's position would have concluded that Robert posed an imminent threat of harm to McDonald that would justify the use of deadly force.

Likewise, a reasonable officer in Rumford's position would have believed that Robert posed an imminent threat of harm. Rumford had observed all of Robert's actions leading up the deadly sequence of shots and was standing within forty feet from the front of the loader when he deployed deadly force. Moreover, he knew that Robert had been drinking earlier that day, and had made numerous threatening gestures and remarks to police officers. All of these facts would lead a reasonable officer to believe that Robert presented an imminent threat of harm to Rumford.

Plaintiffs unconvincingly argue that Robert did not post an immediate threat to the safety of the officers. Plaintiffs argue three points in support of their argument. First, Plaintiffs state that Robert had already been shot by the officers and lost control of the loader when he hit Lilley's vehicle, thus implying that Robert also did not have control of the

33

loader when it drove towards McDonald, Beighle, Rumford and others.  Second, Plaintiffs contend that the officers were able to move out of the way of the slowly moving loader. Third, they suggest that the officers placed themselves in harms way, "such as Lilley purposely stepping out of concealment and towards the loader." However, the uncontested facts do not support any of these assertions.

Plaintiffs have offered no evidence that Robert had lost control of the loader before the loader accelerated towards McDonald, Beighle, and Rumford's position.  The Sixth Circuit has recognized that an officer may not respond with deadly force unless the suspect *willfully* places the officers in imminent harm.  *Sigley v. City of Parma Heights*, 437 F.3d 527, 535 (6th cir. 2006) (emphasis added) (quoting *Estate of Starks v. Enyart*, 5 F.3d 230, 235 (7th Cir. 1993)).  Here, the record evidence shows that Robert did, in fact, willfully place the officers in imminent harm.  After making numerous threatening comments and gestures, Robert drove a multi-ton front loader at a police vehicle, pushed it down a hill, turned the loader directly at officers, and accelerated.  This amount of maneuvering could only demonstrate that Robert was in control of the loader and willfully driving with an intent to harm.  The only "evidence" that Plaintiffs offered to the contrary is a statement made by neighbor-bystanders, which was not made part of the record and cannot be considered pursuant to Federal Rule of Civil Procedure 56(c)(1)(A).  *See supra* note 3.

Plaintiffs' argument that the officers were able to move out of the way of the slow moving loader is also not supported by the record.  "Slow moving" is a relative term that mischaracterizes the threat of the loader.  Although Lt. Lilley was unable to estimate an exact speed of the loader, he stated that he was unable to keep up with it while running. Detective Jaskowiak estimated that the loader was traveling between twenty and twenty-

34

five miles per hour at one point.  Second, it is not reasonable to conclude that the officers could have moved out of the loader's way.  To the contrary, Trooper McDonald was only five feet away from the loader, which was accelerating, when Lilley and Beighle opened fire.  Although Rumford was approximately forty feet away when he felt that he was threatened, other accounts of the loader's speed and Robert's ability to maneuver the loader indicate that Rumford could not have ran from the loader. In such a face-paced situation where the officers were required to make the split-second decision to either flee or shoot, the Court will not use the benefit of 20/20 vision in hindsight to conclude that the officers had the opportunity to run from the quickly approaching loader and escape imminent harm.  *See Graham*, 490 U.S. at 396-97 (holding that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that the Court must allow "for the fact that police officers are often forced to make split-second judgments.").

Robert was also armed at all times while he was on the loader.  Although he had not pointed the gun at the officers while he was driving, he had waved the gun in the air at least once, seemingly as a threat to the officers that he was armed.  Earlier in the standoff, Robert had pointed a gun directly at Rumford and Robb.  Given these facts, even if the officers could have evaded the oncoming loader on foot, it would have been unreasonable and entirely unsafe for the officers to turn their backs on the loader and run for their safety.

Additionally, Plaintiffs argue that the officers placed themselves in harms way.  The Sixth Circuit has recognized that "where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive."  *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008).  In *Kirby*, an officer fired at a moving vehicle because the officer

35

believed the vehicle posed an imminent threat of harm.  *Id.*  The *Kirby* Court, however, found that the officer "placed himself in potential danger by moving towards the rolling [vehicle] instead of *fleeing or simply remaining where he was*" and held that the officer's use of deadly force was excessive.  *Id.* (emphasis added).

Here, unlike the officers *Kirby*, the officers did not place themselves in harms way.  In fact, when Robert maneuvered the loader to within five feet of McDonald's position, McDonald retreated from the loader's path and discharged his weapon.  Similarly, as the loader approached Rumford's position, he stepped from behind hay bales to get a clear shot at Robert, and then discharged his weapon.  By all accounts, Rumford was in the loader's path both before and after he moved from behind the hay bale.  There is simply no evidence to indicate that Rumford placed himself in harms way before shooting.

Lt. Lilley is the only officer that Plaintiffs have identified who potentially placed himself in harms way.  However, Plaintiffs argument is factually incorrect and irrelevant.  As Robert drove the loader towards McDonald, Beighle, Rumford and others, Lilley moved toward the side of the loader to get a clear shot at Robert.  Simply put, Lilley was never in harms way.  Moreover, Lilley has not argued that he fired at Robert because he feared his own life was in danger.  Instead, Lilley fired at Robert to protect *other* officers from imminent harm.  Thus, Lilley's position in relation to the loader is irrelevant.

Ultimately, the second *Graham* factor weighs heavily in favor of the Defendants' use of force.  Robert was driving a multi-ton front-end loader directly at officers, and was within five feet of at least one officer, when Defendants opened fire.  Under these circumstances, reasonable officers would have believed that Robert posed an imminent threat of harm to themselves or other officers.

36

### (c)    Actively resisted or attempted to evade arrest

The third *Graham* factor – "whether [the suspect] actively resisted arrest *or* attempted to evade arrest by flight" – also weighs heavily in favor of Defendants. *Graham*, 490 U.S. at 396 (emphasis added).   Robert resisted arrest from the very outset of the prolonged standoff.   As Rumford emerged from his vehicle to make initial contact with Robert, Rumford looked towards the house and saw Robert pointing a rifle directly at him. Rumford told Robert, "put your gun down . . . we're just here to help you . . . [w]e're just here to talk to you." (Doc. # 78-2, p. 30).   Refusing to comply, Robert responded, "I'm done talking.  I don't want to talk . . .you get [Trooper Robb] and get off my property." (*Id.* at 30.) Robert also stated, "I could've took you two out coming back the driveway," implying that he could have shot Rumford and Robb before they ever arrived at the residence.   (*Id.* at 31).   Trooper Robb also repeatedly told Robert to put his weapon down, but Robert refused to comply.

Lieutenant Lilley also attempted to take Robert into custody, but Robert resisted. By the time Lilley arrived on scene, Robert had barricaded himself inside the shop and armed himself with two rifles.   Lilley attempted to contact Robert at least four times via telephone to get him to surrender.   Twice, Robert answered the phone, cursed Lilley and hung up before Lilley had the opportunity to say anything.   Lilley also used the public address system in his vehicle to yell for Robert to come out of the shop.   Instead of surrendering, Robert emerged from the shop on multiple occasions and shook his fist or the rifle in the air at the officers.

Robert continued to evade arrest as he drove around his property on the loader.  At one point, he stopped the loader in front of Lilley and yelled, "where the son of a bitch, the

mother fucker who wanted to talk to me, where is he at now?" (Doc. # 78-5, p. 69). Robert stopped the loader a second time and yelled to Rumford, "Move your fucking car, Herb." (*Id.* at 71). A short time later, Robert stopped the loader a third time and again yelled at the officers. This time, however, Robert was holding a rifle at its midpoint and shaking it at the officers. When all of these instances are considered in combination, Robert evaded arrest and continually refused to submit to the officers' repeated demands. Accordingly, the third *Graham* factor weighs in favor of Defendants' use of deadly force.

Despite the overwhelming and uncontested evidence that Robert evaded arrest, Plaintiffs argue that the third *Graham* factor weighs in their favor because Robert was in a "contained" area when the officers deployed deadly force. However, the uncontested evidence simply does not support this conclusion. At best, the evidence indicates that the officers had established a perimeter around Robert. There is absolutely no indication that Robert was "contained." Instead, Robert freely drove about his property on the loader despite repeated commands to surrender. The officers even attempted to "contain" Robert by shooting at the tires on the loader, however those attempts were unsuccessful. In fact, Rumford testified that there was nothing the officers could have done to prevent Robert from fleeing his property and driving the loader onto the adjacent highway. In short, while Robert may not have attempted to flee the scene, the evidence clearly indicates that Robert continually evaded arrest.

Having considered the totality of the circumstances, and giving consideration to each of the *Graham* factors, Defendants Lilley, Beighle,[10] and Rumford's use of force was

_____

[10] Defendants Lilley and Beighle also deployed deadly force when they shot at the tires on the loader. However, this use of force did not constitute a "seizure" under the Fourth Amendment. As the Supreme Court explained in *Terry v. Ohio*, a seizure occurs "only when the officer, by means of physical force or show of

constitutionally reasonable.  As such, they did not violate Robert's Fourth Amendment rights.

### (b)      Clearly Established Right

For the sake of completeness, the Court assumes *arguendo* that the individual Defendants used excessive force in violation of Robert's Fourth Amendment rights and, thus, moves to the second step of the qualified immunity analysis.  "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotations omitted).  "In the excess-force context, it is not enough for a plaintiff to demonstrate that an officer's use of force exceeded the objective standard of reasonableness articulated in *Graham.*  Rather, qualified immunity is proper unless it would be clear to a reasonable officer that his use of excessive force was unlawful in the situation he confronted." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901-02 (6th Cir. 2004).

To determine whether the right is clearly established, the Court must "look first to decision of the Supreme Court, then to decision of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits."  *Id.* at 902 (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)).   Plaintiffs must "show the prior articulation of a prohibition against the type of excess force exerted here."  *Id.*  They may show that the

---

authority, has in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392 U.S. at 19 n.16.  Here, the uncontested evidence indicates that the shots had no effect on the loader's movement.  Instead, after the shots were fired, Robert was able to turn the loader and drive it directly at officers.  Because these shots had no effect on Robert, and did not cause him to submit to the officers' show of authority, he was not seized at that time.  Thus, Lilley and Beighle did not violate Robert's Fourth Amendment rights when they shot at the tires on the loader.

actions taken here were unlawful "from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."  *Id.*

Here, Plaintiffs contend that the individual defendants fail the second prong of the qualified immunity analysis because they violated Robert's clearly established right to be free from excessive force during his arrest.  While the Court agrees that arrestees have a clearly established right to be free from excessive force, this statement of the law does not accurately reflect the Court's inquiry at this step.  Instead, the Court must determine whether the right the Defendants allegedly violated was "clearly established in a more particularized, and hence more relevant, sense."  *Id.*

At the time of the shooting, it was clearly established in the Sixth Circuit that Robert "had a right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others[.]" *Green v. Taylor*, 239 F. App'x 952, 960 (6th Cir. 2007) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).  Here, the evidence simply does not support Plaintiffs' position that Robert was not posing a serious imminent threat of death to the officers. After making numerous threats, pointing a weapon at officers, and refusing to surrender, Robert drove a multi-ton front-end loader into a police vehicle.   He then turned the loader and accelerated towards several officers, coming within five feet of Trooper McDonald. Contrary to Plaintiffs' assertion, this uncontested evidence shows that the officers reasonably believed that Robert posed an imminent danger to their safety.  Clearly, the officers use of deadly force to protect themselves and others from an oncoming front-end loader did not violate clearly established law.  Accordingly, Plaintiffs have failed to show that it was clearly established that Defendant Lilley, Jaskowiak and Rumford's use of deadly force was excessive and, thus, unlawful in the situation they confronted.

**4.    The Fourteenth Amendment Claims in Counts 5 and 10 of the Amended Complaint are Dismissed Because Excessive Force Claims are Properly Analyzed under the Fourth Amendment**

Counts 5 and 10 of Plaintiffs' Amended Complaint allege that the Individual Defendants, and Bracken and Campbell Counties, respectively, violated Robert's Fourteenth Amendment Due Process Rights.  Aside from the facts supporting the excessive force claims, Plaintiffs do not allege any additional facts to support these Fourteenth Amendment claims.  The Supreme Court has made clear that "*all claims* that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham,* 490 U.S. at 395.  The Court more recently clarified that "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997).  Here, Plaintiffs have alleged that the individual Defendants used excessive force against Robert during the course of an arrest and, thus, the claim is properly analyzed under the Fourth Amendment "reasonableness" standard.  *See Henderson v. Reyda*, 192 F. App'x 392, 396 (6th Cir. 2006) (where excessive force claim arose from officer's seizure of Plaintiff's person, Plaintiff could only proceed under the Fourth Amendment and no the Fourteenth Amendment).  Accordingly, Plaintiffs' Fourteenth Amendment due process claims are hereby dismissed.

41

### 5.    Bracken County is Entitled to Summary Judgment on Plaintiffs' Section 1983 Claims

Count 7 of Plaintiffs' Amended Complaint alleges that Bracken County is liable under 42 U.S.C. § 1983 because its actions, taken under the color of law, caused Robert Bradford to be subject to a deprivation of his rights secured by the Constitution.  Defendant Bracken County has moved for summary judgment on this count, arguing that Plaintiffs have failed to provide a sufficient factual basis to establish municipal liability under Section 1983.

A municipality can only be liable under Section 1983 if the plaintiff establishes that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation."  *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monnell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, "municipalities are liable for harms resulting from a constitutional violation *only* when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monnell*, 436 U.S. at 708 (Powell, J., concurring)).  "'A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability.'" *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)).

Plaintiffs have failed to establish each of the elements necessary to prove municipal liability under Section 1983.  Deputy Herb Rumford was the only Bracken County official that deployed deadly force against Robert.  As explained above, Rumford's use of force was not excessive under the circumstances and did not deprive Robert of his Fourth Amendment rights.  Accordingly, Plaintiffs have failed to demonstrate that a constitutional

42

violation occurred, and Bracken County cannot be liable on a municipal liability theory under Section 1983.  *See Davenport v. Casey*, 521 F.3d 544, 554 (6th Cir. 2008) (holding that the city was entitled to summary judgment because the employee-officer did not violate the plaintiff's constitutional rights); *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."); *Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) ("If the plaintiffs have failed to state a claim for violation of a constitutional right at all, then the City of Forest Park cannot be held liable for violating that right nay more than the individual defendants can.").

Assuming, *arguendo*, that a constitutional violation occurred, Plaintiffs have failed to show that Bracken County is responsible for that violation.  Although Plaintiffs' Amended Complaint does not clearly articulate how Bracken County is liable, Plaintiffs' Response to the Motion for Summary Judgment argues that Rumford took part in a "panic shooting," which "is a clear sign that training was not provided or insufficient."  (Doc. # 83, at 13).  A municipality is responsible for failing to train its officers if the plaintiff can prove three elements: (1) "that the training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [County]'s deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury."  *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Plaintiffs have failed to prove the first two elements of failure-to-train municipal liability.  Plaintiffs' sole proof that Bracken County's training program was inadequate is the expert report of James Werner, which Plaintiffs disclosed for the first time in their Response

43

to the Motion for Summary Judgment.  Werner stated, "[w]hile I do not have training records at this time to confirm the level of knowledge of training of the involved officers for handling these situations, it appears from their actions that this training was not provided or insufficient."  (Doc. # 83-1, at 5).  As explained above, *supra* Section II(A), Werner's report has been stricken from the record pursuant to Federal Rule of Civil Procedure 37(c)(1) because Plaintiffs failed to timely disclose the report in compliance with Rule 26(a)(2).  Without any other proof, Plaintiffs have failed to offer any admissible evidence in support of the first element.

To the contrary, the uncontested evidence of record demonstrates that the Bracken County Sheriff's Office had an adequate policy on the use of deadly force and that Rumford was well trained.  The Sheriff's Office Policy and Standard Operating Procedures Manual states that "[f]orce is excessive when its application is inappropriate to the circumstances, resulting in serious physical injury or death."  (Doc. # 76-2, at 3).  In determining whether force is excessive, the manual states that "the primary concern is whether the on-scene deputy reasonably believes that its application was necessary and appropriate."  (*Id.*).  Plaintiffs do not contest that this policy is adequate.

 Moreover, the record demonstrates that Rumford received criminal justice training at the police academy in Richmond, Kentucky in 1988.  (Doc. # 78-2, p. 10-11).  While there, Rumford was instructed on the use of deadly force.  (*Id.*).  Although Rumford did not receive additional training on the use of force from the Bracken County Sheriff's Office, he was required to attend 40 hours of continuing police training each year.  Rumford also explained that "[i]t's always been [Bracken County's] police to just use no more force than necessary to execute an arrest."  (*Id.* at 98).  Together, these facts show that Rumford had

44

received adequate training on the use of deadly force.

Even if Werner's report had been considered, and sufficiently proved the inadequacy-of-training prong, Plaintiffs have failed to offer any proof that any potential inadequacy in Bracken County's training on the use of deadly force was the result of deliberate indifference.  "To show deliberate indifference, Plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the county has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Plinton*, 540 F.3d at 464 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).  Alternatively, the plaintiff may prove "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)).

Simply put, Plaintiffs have not established deliberate indifference.  The evidence shows that Rumford began his service as a police officer in 1985 with the Brooksville Police Department, received formal training at the police academy in 1988, transferred to the Bracken County Sheriff's Department in 1999, and retired 2010, without ever being disciplined for his actions.  Rumford had never deployed deadly force before the night of May 31, 2009 when he shot at Robert Bradford.  There is nothing about Rumford's record of service that shows Bracken County ignored a history of abuse or failed to train based on an "obvious potential" for the excessive use of force.  *See id.*  (holding that the plaintiff failed to prove that an officer had an "obvious potential" to violate constitutional rights when he was experienced and well trained at the time he was employed by the defendant municipality).  For all of these reasons, Bracken County is entitled to summary judgment

45

on Plaintiffs' Section 1983 claims.

### 6.    Campbell County is Entitled to Summary Judgment Because the Record is Devoid of Evidence that Campbell County, or One of its Employees, Violated Robert Bradford's Constitutional Rights

Plaintiffs have failed to offer any evidence to prove that Campbell County is liable under Section 1983.  Plaintiffs offered no evidence to suggest that a Campbell County officer deployed deadly force against Robert, or otherwise violated Robert's constitutional rights.  Therefore, Plaintiffs cannot prove the first element of municipal liability under Section 1983, namely that Robert's death was caused by conduct that violated his constitutional rights.  *See Spears*, 589 F.3d at 256.  Plaintiffs have also failed to offer any proof in support of the second element of municipal liability because there is no indication that an alleged constitutional violation resulted from the implementation of Campbell County's official policies or established customs.  *See id.*  Thus, Plaintiffs, as the non-moving parties, have failed to produce evidence showing that a genuine issue of fact remains for which a reasonable juror could decide in the Plaintiffs favor.  *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  Accordingly, Campbell County is entitled to judgment as a matter of law on Plaintiffs' Section 1983 claim.

### 7.    Bracken and Campbell County are Not Liable for any Alleged Violations of Robert Bradford's Kentucky Constitutional Rights

Count 9 of Plaintiffs' Amended Complaint alleges that Bracken and Campbell County "authorized and ratified the wrongful conduct" of the individual Defendants,  "failed to establish adequate policies and procedures to properly train" those individuals, and "failed to properly enforce or adopt written policies designed to prevent the type of injury suffered by [Robert]."  (Doc. # 26, ¶¶ 70-72).  As a result, Plaintiffs maintain that Robert was

deprived of civil rights afforded to him by the Constitution of the Commonwealth of Kentucky, rendering the municipal Defendants liable.

Despite Plaintiffs' contention, the municipal Defendants cannot be liable for alleged violations of rights secured by Kentucky's Constitution. The Kentucky Supreme Court recently held that Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 536-37 (Ky. 2011). Specifically, the Kentucky Supreme Court ruled that Kentucky's General Assembly has not authorized a statutory private right of action for state constitutional violations. *Id.* The Court also refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution. *Id.* Accordingly, Kentucky law does not recognize a cause of action to support Plaintiffs' claim, and thus Bracken and Campbell County are entitled to judgment as a matter of law for alleged violations of Robert's Kentucky constitutional rights.

**8.  Defendants Lilley, Jaskowiak, and Rumford are Entitled to Qualified Official Immunity on Plaintiffs' State Law Battery and Negligence Claims**

Plaintiffs state-law battery and negligence claims against Defendants Lilley, Jaskowiak, and Rumford are barred because the Defendants are entitled to qualified official immunity. Under Kentucky law, a public officer is entitled to qualified immunity from liability "for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies "to the negligent performance by a public officer of employee of (1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary

47

authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523.

Defendants have shown *prima facie* that their use of deadly force was within their discretionary authority. Under Kentucky law, a peace officer "is entitled to use such force as is necessary, or reasonably appears so, to take a suspect into custody." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007). As previously stated, each of the officers has shown that they acted pursuant to this authority in using objectively reasonable deadly force against Robert in order to effect an arrest and protect other officers from perceived imminent harm. Thus, the burden shifts to Plaintiffs to establish that the officers deployed deadly force in bad faith.

Plaintiffs unconvincingly argue that "[t]he officers' bad faith can be inferred from their violations of Bradford's clearly established constitutional rights." (Doc. # 83 at 11). "Bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position . . . ; or if the officer or employee *willfully or maliciously* intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523. As already discussed herein in great detail, the officers' use of force was objectively reasonable and, thus, they did not violate Robert's clearly established constitutional rights. Likewise, Kentucky statutory law entitled the officers to use deadly force to protect themselves or others against death or serious physical injury. KRS §§ 503.050 and 503.070. Moreover, Plaintiffs have not offered any proof that the officers willfully or maliciously intended to harm Robert in a way that was not authorized by law. Accordingly, Defendants Lilley, Jaskowiak, and Rumford are entitled

48

to qualified official immunity on Plaintiffs' state law battery and negligence claims.

### 9. Defendants are Entitled to Judgment as a Matter of Law on Plaintiffs' Loss of Consortium Claims

Plaintiffs also bring loss of consortium claims against various individual Defendants. "Kentucky law is clear that loss of consortium is derivative of an injured plaintiff's claim." *Norton v. Canadian American Tank Lines*, No. 06-411-C, 2009 WL 931137, at *1 (W.D. Ky. Apr. 3, 2009) (citing *Daley v. Reed*, 87 S.W.3d 247 (Ky. 2002) and *Godbey v. Univ. Hospital of Albert B. Chandler Medical Center, Inc.*, 975 S.W.2d 104, 106 (Ky. Ct. App. 1998)). Where the underlying claim fails, the derivative claim must also fail. *See Godbey*, 975 S.W.2d at 106 (holding that the wife was not entitled to damages on her loss of consortium claim because the husband failed to prove a necessary element of his underlying claim). Thus, because each of the underlying claims brought by the estate of Robert Bradford have failed, Defendants are also entitled to judgment on the derivative loss of consortium claims.

### III.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)    Defendants Joint Motion to Strike Plaintiffs' Expert Report (Doc. # 85) is hereby **GRANTED**;

(2)    Defendants Herb Rumford, Bracken County, and Campbell County's Motion for Summary Judgment (Doc. # 76), and Defendants Tom Lilley, Aaron Beighle, Steven Robb, and Christopher Jaskowiak's Motion for Summary Judgment (Doc. # 77) are hereby **GRANTED**;

(3)      Plaintiffs' Expert Report (Doc. # 83-1) is hereby **STRICKEN** from the record;

(4)      Plaintiffs' federal and state law claims are hereby **DISMISSED WITH PREJUDICE**;

(5)      This case is hereby **STRICKEN** from the active docket of this Court; and

(6)      A Judgment in favor of Defendants will be entered contemporaneously herewith.

This 13th day of June, 2012.



G:\DATA\Opinions\Covington\2009\2-09-115 MOO Granting MSJs.wpd